UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TENNESSEE
AT CHATTANOOGA

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | 1:09-cr-89 |
| ) | COLLIER/CARTER |
| ERIC M. COUSIN ) | |

REPORT AND RECOMMENDATION

I. Introduction

The defendant's Motion to Suppress Evidence (Doc. 12) is pending before the undersigned Magistrate Judge having been referred by the District Court for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and (C). Defendant's motion arises from a traffic stop occurring on January 27, 2009, made by Officer Marvin Crider in East Chattanooga. The defendant asserts the traffic stop was illegal and the subsequent search of his vehicle was also illegal. For the reasons stated herein, it is RECOMMENDED the defendant's motion to suppress (Doc. 16) be DENIED.

II. Relevant Facts

The undersigned held an evidentiary hearing on the defendant's motion to suppress on Thursday, October 8, 2009. Atty. John Nicoll represented the defendant. The government was represented by Asst. United States Attorney Scott Winne. The only witness to testify was Officer Scott Crider of the Chattanooga Police Department, who testified to the following: He has been employed by the Chattanooga Police Department for fourteen years. In January of 2009, he was a patrol officer. On January 27, 2009, at approximately 2:50 pm, he was conducting routine patrol in a "weed and seed" area of East Chattanooga. Traveling down Stuart Street, Officer Crider approached the intersection of Stuart Street and Noah Street which runs perpendicular to Stuart

Street. As he approached that intersection, Officer Crider saw a white Suburban traveling on Noah Street make a rolling stop through the Noah/Stuart intersection. In other words, when the Suburban approached the stop sign on Noah Street, just before the intersection, it slowed a little but then continued rolling through the intersection without coming to a complete stop. Officer Crider then turned right onto Noah Street and followed the Suburban. Crider observed that the driver was not wearing a seatbelt and had a cracked side mirror. He initiated his blue lights which automatically initiated the video camera mounted next to his rear view mirror. The defendant then turned right on Wilder Street, a street which runs perpendicular to Noah Street and parallel to Stuart Street. Upon turning onto Wilder Street, the defendant pulled over and stopped. The video camera backs up fifteen seconds before the camera is initiated. Therefore, the video recording of the traffic stop begins fifteen seconds before Officer Crider initiated his blue lights. The rolling stop on Noah Street was not caught by the video camera.

Normally, there is an audio recording as well as a video recording but the audio equipment had not been working and the parts necessary to repair the audio system had not come in yet. Thus, there is only a visual recording of the traffic stop. Crider testified it had been a couple of weeks since his audio worked.

Once the Suburban stopped, Crider stopped in his patrol car behind the Suburban and exited. He had already run a check on the tag number of the Suburban. Crider was by himself and was being cautious out of concern for his safety. He did not know who was driving the Suburban until he walked up to the driver, in this case, the defendant. The defendant was alone in the vehicle. Crider explained to the defendant why he had stopped him and asked for his driver's license. The defendant was extremely nervous. His voice quivered and his hands were shaking as

2

he handed him the driver's license. Crider recognized him from a previous misdemeanor arrest and conviction for a firearm in 2004. The defendant immediately asked Crider to "give me a break, give me a break." Crider asked what he needed a break for and the defendant said his license was suspended. Crider told him if that is all, "you don't need to be so nervous." Crider also knew that the defendant had at least one conviction on a marijuana charge. Based on the defendant's extreme nervousness and the knowledge of his prior convictions, Crider asked the defendant if he had any drugs or guns in the car. The defendant said "no," and offered to let him search.

      Crider could not remember the exact words of the defendant, whether the defendant said he could "search" or "check," but Crider was sure he offered to allow him to search the vehicle. Crider returned to his patrol car to complete a driver's license check on the defendant. This took a little over two minutes. Crider was able to determine from the license check that defendant was driving on a suspended license and that defendant had previous offenses of driving on a revoked license.

      While Crider was conducting the license check, he was watching the defendant through the Suburban's rear view mirror. He saw the defendant's head duck down at least twice and move toward the passenger front seat. With the defendant's history of weapons and narcotics, coupled with the defendant's extreme nervousness, the movement in the vehicle caused Crider to be concerned that the defendant was arming himself or hiding something underneath the seat of the car. Therefore, when Crider approached the defendant again, he asked him once again if he had any guns on him or things that might poke or stick him. The defendant said "no." Crider asked him to exit the vehicle. Crider asked him, "do you mind if I go in your pockets?"

3

Defendant was being very cooperative and stated, "no." Crider did not actually search inside defendant's pockets but patted him down for weapons and found none. The video shows Crider asking the defendant something and the defendant shaking his head no. The Court cannot ascertain with any certainty what exactly occurred in that exchange but Crider testified that may have been when Crider asked the defendant if the defendant minded if he searched him and Crider said "no." Crider directed the defendant to step toward the hood of the patrol car which the defendant did. While walking from his car to the patrol car, the video shows the defendant has a deflated look on his face. [1]

Crider began his search by looking in the driver's side of the car and then on the passenger's side. As Crider was conducting the search, he was watching the defendant carefully through the rear view mirror. Crider also looked in the center console and popped out the cup holders revealing several bags of marijuana. Crider returned to the defendant and placed him under arrest for possession of illegal substances. At that time, he also gave the defendant verbal Miranda warnings. Crider had already called for backup. As he continued searching the Suburban, he found cocaine and a loaded revolver. Crider asked the defendant, "Eric, if you knew all that stuff was in the car, why did you consent?" Cousins replied that Crider was going to search anyway so what did it matter. He had to sell drugs to support his family because he couldn't find work. The defendant also stated that the gun was his grandfather's and that he had to support his family.

---

[1] A another traffic stop made by Officer Crider on April 12, 2007, was the subject of a motion to suppress in *United States v. Cordell Stamper*, 1:07-cr-85. During that traffic stop, both Officer Crider's video and audio equipment were operating. *United States v. Cordell Stamper*, Docket No. 1:07-cr-85 (E.D. Tenn. Dec. 7, 2007) (unpublished).

Crider testified that the reason for the traffic stop was a failure to come to a complete stop, failure to wear a seatbelt, and a broken side mirror.

Officer Crider admitted that he has indicated in dozens of police reports that suspects appeared extremely nervous with visibly shaking hands and quivering voice. Officer Crider testified that he makes a point of noting such indications whenever they are observed as he believes they are significant. He also testified he "typically sees extreme nervousness with narcotics arrests." Crider also stated that he often cites furtive movements when he observes a driver or passenger making such movements in a stopped vehicle. The following were factors which Crider considered and which raised his suspicion that the stop was more than a mere traffic stop: the defendant's extreme nervousness, that the defendant was driving on a revoked license and had been cited for driving without a license several times, and that defendant had been convicted of a misdemeanor firearms charge and convicted on a marijuana charge in the past, and the movement of the defendant in the vehicle, particularly his leaning down towards the passenger seat. The defendant's movement in the car, in particular, caused Officer Crider to be concerned for his safety. He thought the defendant was either hiding something under the seat or retrieving a weapon from under the seat.

During the suppression hearing, the defendant proffered videos of two other traffic stops conducted by Officer Crider. The Court declined to admit the videos into evidence finding that they were not relevant to the instant case because each traffic stop is based on the unique circumstances at hand.

III. Analysis

Defendant asserts all evidence obtained on January 27, 2009 as a result of the traffic stop must be excluded on the following grounds: the initial traffic stop was illegal; the time, place and manner of the stop were excessive under the circumstances; the search of his vehicle was without probable cause and without a valid exception to the warrant requirement; and any statements he made to Officer Crider are fruit of the poisonous tree.

When police have probable cause to believe the driver of a vehicle has committed a traffic violation, they may stop the vehicle. *United States v. Bradshaw*, 102 F.3d 204, 210 (6th Cir. 1996) (so long as the officer has probable cause to believe that a traffic violation has occurred, the resultant stop is not unlawful and does not violate the Fourth Amendment); *United States v. Ferguson*, 8 F. 3d 385, 391 (6th Cir. 1993) (A traffic stop is reasonable if there is probable cause to believe a traffic violation occurred and what else the officer suspected about the driver is irrelevant). Here, Crider testified he saw the defendant fail to make a complete stop at a stop sign in violation of Tennessee law. *See* Tenn. Code. Ann. § 55-8-149(c) (requiring "every driver of a vehicle" to stop at a stop sign before proceeding across the street), *see also* Tenn. Code. Ann. § 55-8-101 ( "'Stop,' when required, means complete cessation from movement.")

Defendant argued that Officer Crider could not possibly have seen him from Crider's position on Stuart Street. Defendant submitted a photograph taken from a position looking down Stuart Street toward Noah Street. The stop sign at Noah Street was not visible in the photograph. However, this photograph was taken when leaves were still on the trees and they obstructed the view down the street. The stop at issue here occurred in January when there were no leaves on

6

the trees. In addition, Crider testified he was farther down the street than the point from which the photograph must have been taken. I therefore conclude that this photograph alone is not sufficient to discredit Officer Crider's credible testimony that he saw the defendant make a "rolling stop" at the intersection of Noah and Stuart Streets. Defendant has presented no evidence himself that he did not make a "rolling stop." Accordingly, I conclude Officer Crider saw the defendant make a rolling stop and therefore had probable cause to believe defendant had committed a traffic violation and had a constitutional basis to make the initial traffic stop.

### 2. Length of the Stop

Defendant argues that he was detained for an unreasonable amount of time during the traffic stop thereby violating the Fourth Amendment. A traffic stop includes those normal activities which are routinely carried out during such a stop, *e.g.,* checking the driver's license, registration, and proof of insurance. *See Berkemer v. McCarty*, 468 U.S. 420, 439 (1984); *United States v. Hill*, 195 F.3d 258, 269 (6th Cir.1999). The driver of a vehicle may be detained until after the officer has finished verifying the driver's license and checking other records as these acts are within the purposes of the initial stop. *See United States v. Ellis*, 497 F.3d 606, 613-14 (6th Cir. 2007) (asking for identification and about one's travel itinerary and purpose of travel was appropriate during traffic stop); *United States v. Garrido-Santana*, 360 F.3d 565, 572-74 (6th Cir. 2004) (rejecting defendant's contention that reasonable suspicion was necessary to continue to detain driver after valid traffic stop for speeding in order to conduct computer check of driver's license even though courtesy citation for speeding had already been issued); *Hill*, 195 F.3d at 269 (driver's license check, which was completed after citation for traffic offense was issued, was within original scope of traffic stop). Police may also lawfully ask for consent to

7

search and whether the driver possesses contraband during the course of the traffic stop. *See United States v. Burton*, 334 F.3d 514, 518-19 (6th Cir. 2003) (asking for consent to search did not unreasonably extend the scope of an ordinary traffic stop)*; see also, United States v. Palomino*, 100 F.3d 446, 449 (6th Cir. 1996); *United States v. Martinez*, 356 F. Supp.2d 856, 863 (M.D. Tenn. 2005). Moreover, "[a]n officer's inquiries into matters unrelated to the justification for the traffic stop ... do not convert the encounter into something other than a lawful seizure, so long as those inquiries do not measurably extend the duration of the stop." *Arizona v. Johnson*, 129 S.Ct. 781, 788 (Jan. 26, 2009).

Once the purpose of the traffic stop is completed, the officer may not "measurably extend the duration of the stop" unless further information arises to support reasonable suspicion sufficient to justify continued detention. *Id.*; *see also*, *United States v. Perez*, 440 F.3d 363, 370 (6th Cir. 2006); *United States v. Mesa*, 62 F.3d 159, 162 (6th Cir. 1995). "Reasonable suspicion is more than an ill defined hunch; it must be based upon a particularized and objective basis for suspecting the particular person ... of criminal activity," given the totality of the circumstances. *United States v. Cortez*, 449 U.S. 411, 417-18 (1981); *accord*, *United States v. McCauley*, 548 F.3d 440, 444-45 (6th Cir. 2008).

Within the first two minutes of the traffic stop, before Crider had the chance to run a license check on the defendant, defendant gave his consent to search his vehicle for drugs and guns. Defendant was still sitting in his car. Thereafter, Officer Crider took a little over two minutes to run the license check before he asked the defendant to step out of the his vehicle, and Crider began his search. At no time did defendant revoke his consent. Crider did not draw his

8

weapon at any time nor was he hostile to the defendant. The undersigned concludes the time and manner of defendant's detention did not exceed constitutional boundaries.

### 3. The Validity of Defendant's Consent to Search

A search conducted pursuant to a valid consent is a well-recognized exception to the general warrant requirement of the Fourth Amendment. *Schneckloth v. Bustamonte*, 412 U.S. 218 (1973). A search may be conducted without a warrant if a person with a privacy interest in the place to be searched gives free and voluntary consent. *United States v. Elkins*, 300 F.3d 638, 647 (6th Cir. 2002). The determination of "whether a consent to a search was in fact 'voluntary' or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of all of the circumstances." *Schneckloth v. Bustamonte*, 412 U.S. at 227. The appropriate inquiry is whether, taking into account all the circumstances surrounding the encounter, a reasonable person would feel free to decline the officer's request or otherwise terminate the encounter. *Florida v. Bostick,* 501 U.S. 429, 435-37 (1991). The government must establish that consent was voluntary by a preponderance of the evidence, with evidence that is clear and positive. *United States v. Canipe*, 569 F.3d 597, 602 (6th Cir. 2009); *United States v. Erwin*, 155 F.3d 818, 823 (6th Cir. 1998). For consent to be voluntary, it must be unequivocal, specific, intelligently given, and free from duress or coercion. *Canipe*, 569 F.3d at 602; *Erwin,* 155 F.3d at 823 (citing *United States v. Scott*, 578 F.2d 1186, 1188-89 (6th Cir. 1978)).

Officer Crider did not threaten or coerce the defendant into giving consent, nor did he trick the defendant. In fact, the defendant volunteered to allow Officer Crider to search. The defendant has prior experience with the law and thus should understand his rights. Thus, at the time defendant gave his consent to search, it certainly appeared by all reasonable indicia to be

9

voluntarily and knowingly given consent to search. After Crider searched the vehicle, when Officer Crider asked the defendant why he had allowed Crider to search when defendant knew contraband was in the car, the defendant replied that he knew Crider would search anyway. In general, "mere acquiescence does not suffice to establish free and voluntary consent." *United States v. Moon*, 513 F.3d 527, 538 (6th Cir.2008) (citing *Bumper v. North Carolina*, 391 U.S. 543, 548-49 (1968)). However, at the time Officer Crider undertook to search defendant's vehicle, defendant had not expressed "mere acquiescence." In fact, the defendant had *offered* to allow Crider to search. I therefore conclude Officer Crider acted reasonably in relying on defendant's representations that he could search, and I find no violation of the Fourth Amendment. *See Florida v. Jimeno*, 500 U.S. 248, 251 (1991) ("The standard for measuring the scope of a suspect's consent under the Fourth Amendment is that of 'objective' reasonableness-what would the typical reasonable person have understood by the exchange between the officer and the suspect?"); *accord United States v. Bradley*, 163 Fed.Appx. 353, 356 (6th Cir. Dec. 21, 2005)

### *4. Defendant's Statements Made in the Patrol Car*

After Officer Crider found the contraband in defendant's vehicle, Crider placed defendant under arrest. While in the patrol car, defendant made incriminating statements. Defendant does not argue that these statements were made in response to police interrogation and should be suppressed because he did not receive *Miranda* rights or was coerced into giving the statements. Defendant argues simply that because the initial stop, the subsequent search, the arrest, and his detention in the patrol car were constitutionally invalid, then any statements he made in the patrol car are fruit of the poisonous tree and must be suppressed. Having concluded there was no

10

Case 1:09-cr-00089-TRM-CHS   Document 30   Filed 11/18/09   Page 10 of 11   PageID #: 163

constitutional violation prior to defendant's making statements in the patrol car, I conclude defendant's fruit of the poisonous tree argument also fails.

## IV. Conclusion

Therefore, for the reasons stated herein, it is RECOMMENDED that defendant's motion to suppress evidence (Doc. 12) be DENIED.[2]

Dated: November 18, 2009        s/William B. Mitchell Carter
                                UNITED STATES MAGISTRATE JUDGE

---

[2]Any objections to this Report and Recommendation must be served and filed within ten (10) days after service of a copy of this recommended disposition on the objecting party. Such objections must conform to the requirements of Rule 72(b) of the Federal Rules of Civil Procedure. Failure to file objections within the time specified waives the right to appeal the District Court's order. *Thomas v. Arn*, 474 U.S. 140, 88 L.Ed.2d 435, 106 S. Ct. 466 (1985). The district court need not provide *de novo* review where objections to this report and recommendation are frivolous, conclusive or general. *Mira v. Marshall*, 806 F.2d 636 (6th Cir. 1986). Only specific objections are reserved for appellate review. *Smith v. Detroit Federation of Teachers*, 829 F.2d 1370 (6th Cir. 1987).